IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

DANIELLE CARNE,

    Plaintiff,

v.                                                                                              Case No. <u>18-cv-818</u>

JAMES J. DALEY (in his individual capacity),

    Defendant.
_____

## COMPLAINT
_____

NOW COMES THE PLAINTIFF, Danielle Carne, by her attorneys Gingras, Cates & Wachs, LLP by Paul A. Kinne, and hereby states the following as her Complaint in the above-referenced matter.

### NATURE OF PROCEEDINGS

1.    This civil action is brought pursuant to 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution, to redress the retaliatory and sexually discriminatory treatment of plaintiff by Defendant Daley.

### PARTIES

2.    At all times relevant hereto, Danielle Carne (Carne) has been a licensed attorney in the State of Wisconsin. She presently resides within the Western District of Wisconsin.

3.    Defendant James Daley (Daley) is presently the Chairman of the Wisconsin Employment Relations Commission, whose office is located within the Western District of Wisconsin. All conduct attributable to him described in this complaint was undertaken intentionally and committed within the scope of his employment and under color of law.

JURISDICTION AND VENUE

4. This court has jurisdiction over this matter pursuant to 42 U.S.C. § 1983, the First and Fourteenth Amendments to the United States Constitution, and pursuant to 28 U.S.C. §§ 1331 and 1343.

5. This claim may be venued in the Western District of Wisconsin pursuant to 28 U.S.C. § 1391, insofar as all the parties reside and/or do business in this district, and the circumstances giving rise to the claim occurred in this district.

FACTUAL ALLEGATIONS

6. In 2006, Carne took a job as a Staff Attorney with the Wisconsin Employment Relations Commission (WERC).

7. The WERC is an agency of the State of Wisconsin that provides dispute resolution services pertaining to labor and employment matters. The Staff Attorneys at the WERC act as mediators, arbitrators, and hearing examiners in a wide range of workplace disputes involving a broad selection of public and private sector employers and employees.

8. The WERC as an agency became the focus of significant attention starting in February of 2011 when Governor Walker introduced 2011 Wisconsin Act 10, a budget repair bill. Act 10 severely curtailed the collective bargaining rights of Wisconsin's public-sector employees, processes over which the WERC had exercised jurisdiction since the 1950s.

9. In May of 2011, Attorney James Scott (Scott) was appointed by Governor Walker to serve as Chair of the WERC. At that time, Carne was in her fifth year of employment at the agency.

10. In the late spring of 2013, Carne received an unsolicited offer of employment from the Wisconsin Office of State Employment Relations (OSER) to fill the position of Chief Legal Counsel.

11. OSER was an administrative services agency that established, implemented, and monitored compliance with personnel policies for state government employment.

12. State employment positions are broadly divided into classified and unclassified positions. Classified positions must be filled through a civil service hiring process, and employees who pass their probationary period enjoy permanent status in class and just cause protection. Unclassified positions are the much smaller number of statutorily-designated, executive-level positions which may be filled through non-competitive appointments either by the Governor or the Governor's executive appointees.

13. OSER's Chief Legal Counsel position was unclassified and served at the pleasure of OSER's Director, who at the time of Carne's appointment was Greg Gracz (Gracz).

14. Carne accepted the OSER appointment and began serving as its Chief Legal Counsel in June 2013.

15. Subsequently, in January 2015, Carne received a promotion into another unclassified appointment as OSER's Deputy Director, the position that was second in command at the agency. Still, from the time of this promotion until July 2015, Carne continued to serve as OSER's "acting" Chief Legal Counsel. Further, from November 2014 through August 2015, Carne was asked to serve as the "acting" Administrator of OSER's Division of Merit Recruitment and Selection, which oversaw state recruitment and hiring practices.

16. For one period of six months during her tenure, Carne was performing the responsibilities of these three unclassified positions at the same time.

17. In addition to performing the day-to-day responsibilities of her positions, she served on a team charged by Governor Walker's Chief of Staff with assessing agency concerns regarding state personnel policies and processes and evaluating opportunities for business process improvements.

18. Further, when the 2015-2017 Biennial Budget Bill (2015 Wisconsin Act 55) abolished OSER and transferred its functions to a newly-created Division of Personnel Management (DPM) within the Department of Administration, Carne was charged with orchestrating this significant transition.

19. Carne also served as one of the key personnel executives in the State working on matters related to the introduction of 2015 Wisconsin Act 150. Act 150 proposed a significant overhaul of the State's civil service system, including the elimination of the state civil service exams and a shift toward the use of resume screenings, the addition of a list of infractions that would provide immediate cause for discharge of state employees, the lengthening of probationary periods, the elimination of reinstatement eligibility and nearly-complete elimination of restoration rights for State employees, the requirement that disciplinary records would be permanent, and the creation of statutory timelines for expedited processing of civil service disciplinary appeals.

20. For many reasons, the Act 150 overhaul was controversial. Among the controversies was the fact that Walker had infamously cited the strength and integrity of Wisconsin's civil service system when defending his decision to alter public sector collective bargaining rights with Act 10.

21. Around the same time that Act 150 was being introduced and promoted by Governor Walker, it was being shared for the first time with personnel experts employed by the State, including the personnel experts at DPM. The Governor's office gave these agencies the

opportunity to provide feedback regarding "functional" corrections only.

22. As DPM's Deputy Administrator, Carne played a central role in reviews of the bill, in a September 26, 2015 meeting at the Governor's office in which members of the Governor's staff and representatives for the sponsoring legislators were briefed regarding the review, and in the statewide conference call introducing the bill; and she was the point of contact for the feedback solicited from state agencies.

23. Act 150 was introduced before the Senate on October 1, 2015; and the Assembly bill was introduced on October 7, 2015. All the while, Carne had been gathering feedback from the agencies regarding the civil service changes proposed by Act 150. Some of this feedback qualified as the "technical" or "functional" corrections to which the Governor's office request had been expressly limited, but other feedback raised broader, policy concerns related to the proposed changes. As requested, Carne segregated out the technical/functional corrections and compiled them into a document that was provided to the Governor's office on October 8, 2015.

24. Once these corrections had been gathered and submitted as requested, Carne shared with Gracz the extent to which agencies also had communicated more policy-oriented concerns about Act 150, which were left out of the material provided to the Governor's office. In addition to this feedback from the agencies, Carne and Gracz also discussed the serious, persisting concerns harbored within DPM regarding some of the proposed changes. Carne asked Gracz what, if anything, should be done with that information. At that point, Gracz instructed Carne to draft a separate memorandum summarizing those concerns. Carne drafted the memorandum, and on October 16, 2015, Gracz hand-delivered the document to the Governor's Chief of Staff Rich Zipperer, the Governor's Legislative Liaison Cindy Polzein, and DOA Secretary Scott Neitzel.

25. The civil service bill was passed in the legislature, with a vote along party lines, on January 20, 2016. It was signed by Governor Walker at the offices of ManpowerGroup on February 12, 2016.

26. In January 2016, Carne was hired back into a position at the WERC, returning to her classified, non-political, non-policy making position. When she resumed her employment, Scott was still Chairman of the agency. Rodney Pasch (Pasch) and Jim Daley (Daley) were the other two members of the three-person Commission. Pasch had been appointed in 2011 before Carne's earlier departure; and Daley had just become a Commissioner in 2015. Peter Davis continued to serve as the WERC Chief Legal Counsel, as he had for decades. Including commissioners, attorneys, and support staff, there were a total of ten employees at the agency.

27. Not long after Carne's return, Scott revealed to Carne that Daley had been opposed to rehiring her. Raleigh Jones (Jones) also held a staff attorney position at the WERC at that time, and he also told Carne that Daley had expressed dislike for her and engaged in discussions with other staff members regarding this attitude toward her.

28. In May 2016, newspapers in Wisconsin began to run stories about a memorandum discovered by the media through open records requests pertaining to Act 150. On Sunday, May 1, 2016, the Journal Sentinel ran the following headline: "Report Shows Concerns within Walker Administration about Civil Service Overhaul". The article stated that the changes to Wisconsin's civil service system were "strongly criticized" and "blasted" in an October 16, 2015 memorandum from DPM to the Governor's office.

29. On that same day, the front-page headline of the Wisconsin State Journal stated, "HR Slams Civil Service Changes". The article stated that "Walker had touted the law as a signature achievement" and it was "among the most bitterly contentious proposals of the 2015-

2016 legislative session." The article also stated that the memorandum "shows the proposal was deeply controversial even among some in Walker's own administration".

30. The article further discussed the identity of the employee who drafted the memorandum as follows:

> Steineke said a staffer with the governor's office told him the DPM employee who wrote the memo no longer works for the agency. It was not clear who the DPM staffer is or how that employee became separated from the agency.
>
> Department of Administration spokeswoman Laurel Patrick said in a statement that several division staffers provided feedback on the civil service bill, and one of them later left for another job in state government. Patrick said "the concerns raised in the memo have been significantly addressed" but declined to explain how or name the author of the memo.

31. The May 12-18, 2016 volume of the Isthmus also featured an article entitled "The Best Shall Not Serve", with a bi-line stating, "Civil service destruction means party cronies will run state government". The article described the "mysterious staffer" who wrote the memorandum as "one of the experts within the state Division of Personnel Management" who "could see what folly it was to overthrow the state's civil service system".

32. Members of the very small staff of the WERC of course knew of Carne's former position in the State's personnel office, knew when she had left that position, and knew of her intimate knowledge of Act 150. Although Carne publicly never has revealed that she had been the one to draft the memorandum, the idea that she was the "mysterious" state employee was known and a topic of discussion at the WERC.

33. In January 2017, Governor Walker introduced the 2017-2019 Biennial Budget Bill. Among other things, this bill proposed reductions to the WERC's budget and position authority and it changed the structure of the commission. The three part-time Commissioner positions would be reduced to a single, full-time commission position; the Chief Legal Counsel position would be

eliminated; and the agency's Staff Attorney position authority would be reduced from 4.0 full-time equivalent positions (FTE) to 3.0 FTE.

34. In an email message dated February 21, 2017, Davis communicated the following to the professional staff: "I've told [Chairman Scott] that if the budget proposal eliminating the Chief Legal Counsel continues to move thru the legislative process toward certain passage, I would bump back to attorney staff." Davis had long before earned the ability to bump from his unclassified Chief Legal Counsel position back into a classified staff attorney position. With Danielle Carne, Karl Hanson, and Raleigh Jones also holding staff attorney positions, Davis' decision to bump would leave four Staff Attorneys for 3.0 FTE. Discussions began in every corner of the agency about whether someone would have to be laid off and, if so, whom. A significant feature in these discussions was the fact that the civil service statute had been amended by Act 150 to no longer allow layoffs to occur on a strict seniority basis.

35. State employees are allowed to volunteer for partial or full layoff to spare their colleagues from being subject to job elimination. Carne already had shared with Scott a concept in which several WERC Staff Attorneys might collectively volunteer for partial reductions in their full-time positions sufficient to allow four employees to remain working. In response to Davis' email suggesting job sharing, Carne showed Davis the single-page, hand-drawn depiction of the concept she previously had sketched out for Scott.

36. Carne's depiction showed Karl Hanson (Hanson), the least senior staff attorney, remaining at 1.0 FTE, Carne and Jones reducing their positions to .75 FTE; and Davis reducing his position to .50 FTE. Davis' response in that conversation to Carne's drawing was that it was a "great idea", and Davis stated that he was on board, as long as he would have access to health insurance.

37.     In a separate conversation, Carne shared the idea with Jones. Jones indicated that he wanted time to think about it, but then he ultimately agreed several days later to the concept; and Hanson, of course, had no objection because his position was not being affected.

38.     When layoffs appeared to be imminent, a state agency is required to compose a "layoff plan" that details how the reductions will be implemented. Under the direction of Chairman Scott, Carne began drafting a layoff plan that reflected the staff attorneys' willingness to accept partial, voluntary layoffs, in lieu of the elimination of one employee altogether. This layoff plan was presented, as required, to DPM for approval.

39.     On May 1, 2017, the Legislative Fiscal Bureau ("LFB") issued a report to the Joint Committee on finance regarding the changes to the WERC proposed in the 2017-2019 Biennial Budget Bill. The LFB report indicated that the Administration, of course, had asserted that the proposed budget cuts "align[] the commission's staffing levels with the current workload". The LFB's report also includes the following, regarding feedback it had received from the WERC:

> The WERC indicates that while it could address its current workload with the proposed reduction in staffing, it believes one position posed for elimination should be retained due to an anticipated increase in workload from civil service appeals resulting from 2015 Act 150. Act 150 made several changes to the state's civil service system, including the establishment of a specific procedure, with timeliness, for an employee to contest an adverse employment decision. . .. The [] provisions of Act 150 took effect on July 1, 2016. According to the WERC, a reduction in two staff attorneys may make meeting the new time standards problematic, if the Commission's workload increases as state agencies and state employees become more acclimated with the new civil service laws.

40.     At all times when the WERC was providing feedback to the LFB resisting the Staff Attorney reductions, Daley was one of the three WERC Commissioners.

41.     Because the changes proposed to the Commission's structure in the Governor's Budget Bill would result in the elimination of the current three part-time Commissioner positions and the creation of a single, full-time Commissioner position, in the event that the Budget Bill

passed as proposed it was going to be necessary for the Governor's office to appoint an individual to the new position as the Chair and sole Commissioner of the agency. As the Budget Bill awaited passage, the question loomed at the agency as to who would be the new Chair.

42. As directed by Scott, Carne was engaged in communications with Tom Sandine (Sandine), the DPM Director of DPM's Bureau of Merit Recruitment and Selection (BMRS), regarding the proposed, voluntary layoff plan. Although Sandine initially responded that the plan was a good solution, in subsequent calls it became clear that the plan would be rejected.

43. Around this same time, Scott received a telephone call from the Deputy Chief Legal Counsel at the Governor's office. The purpose of the call was to clarify for Scott that it was not clear that Scott would be reappointed to the new, sole Commissioner position. This message was inconsistent with a prior call Scott had received from the Governor's office, on the day the Budget Bill was being released, indicating that the Governor wanted Scott to continue to head the agency. It was known at the WERC at this time that Daley was in regular communications with the Governor's office for the purpose of lobbying for an appointment to the new WERC Commissioner position.

44. In the eight months since she had returned to the WERC's small office, Daley had never spoken to Carne except a brief acknowledgement when she was introduced to him by Davis on her first day of employment.

45. Scott told Carne that he believed Daley had a "problem with women".

46. Sensing that the proposed voluntary layoff plan was doomed, the WERC staff concluded that the attorneys who were willing to accept partial layoffs could simply submit to immediate, internal reductions in their positions. Implementing these changes internally at the WERC prior to the passage of the Budget Bill would eliminate the need for a layoff after passage.

47. On June 12, 2017, Scott received a memorandum from Waylon Hurlburt (Hurlburt), the Director of the State Budget Office and DPM Administrator Gracz. The memorandum indicated that the voluntary reductions were being blocked because the Budget Bill was pending.

48. On June 14, 2017, in a discussion between Daley and Scott regarding WERC's personnel matters and other anticipated changes, Daley stated to Scott that Carne had "done a lot of damage up at the Governor's office". It was clear that Daley had been discussing such matters with the Governor's office.

49. For the remainder of the summer, the idea of position reductions was put on hold, and the staff of the WERC awaited passage of the Budget Bill. In mid-August, Hanson resigned from his WERC Staff Attorney position to accept a position at the Wisconsin Department of Justice. Hanson's departure was a very significant event at the WERC, because the attrition eliminated the need for a layoff if the Budget Bill passed as proposed.

50. On August 29, 2017, the WERC staff gathered over coffee and cake in the small kitchen of the WERC office. Such events occasionally were scheduled at the agency, most often to celebrate staff birthdays. On this occasion, the celebration was marking the last day of employment for Hanson as a WERC Staff Attorney. Such an event would typically last for 30 to 60 minutes. Staff members were not required to attend, but everyone usually did. Carne had been on a conference call for a case she was handling and arrived at the event about ten minutes late. Immediately upon Carne's arrival in the kitchen, Daley abruptly and conspicuously left the event.

51. When the event ended, Scott privately asked Carne why Daley had left when she arrived. Carne told Scott that she had no idea why he had done so. Scott reiterated his belief that it was, in part, a matter of Daley not liking women. "He's ok with [the WERC Paralegal] Dawn

and [the WERC Office Manager] Carol, but that's because they're at a fairly low level. But he doesn't like you because you're a professional."

52. Later that day, Daley visited Davis' office for a lengthy, closed-door discussion. Scott observed that the meeting was taking place and later asked Davis what the discussion was about. Davis told Scott that Daley was seeking reassurance that Davis would continue to serve as his legal counsel if Daley was appointed Chair of the WERC.

53. On August 30, 2017, Scott revealed that Daley had stated, more than once during Carne's tenure, that he did not trust her. Carne asked Scott why that would be the case, and Scott indicated that it was probably Carne's political persuasion.

54. Scott would later reveal there had been multiple occasions on which Daley told Scott that Daley believed Carne was a liability for them because she was a "lefty" and he believed they needed to find a way to get rid of her.

55. On September 21, 2017, Governor Walker signed the 2017-2019 Budget Bill into law. The enactment of the bill gave rise to the changes to the WERC that had been anticipated. The three Commissioner positions became one; the Chief Legal Counsel position was eliminated; and the reduction to the Staff Attorney positions took effect. As a result of Karl Hanson's departure, the remaining staff attorneys fit into the remaining Staff Attorney positions. Thus, the Budget Bill did not necessitate layoffs.

56. Two days later, on September 23, 2017, Daley was appointed Chair of the WERC.

57. At no point in the course of working with Carne would Daley address her or speak to her personally, even for casual workplace conversation.

58. On October 26, 2017, Daley appeared before the Wisconsin Legislature's Senate Committee on Labor and Regulatory Reform. *See video archived on Wisconsin Eye at*

*http://www.wiseye.org/Video-Archive/Event-Detail/evhdid/11941*. Pursuant to statutory a requirement, Daley's appointment as the new Chair of the Wisconsin Employment Relations Commission needed to be confirmed by the Wisconsin Senate. Daley responded to several questions by Committee members regarding the status of the WERC and his plans for the agency. This is Daley's testimony regarding WERC staffing levels at that time, which had incorporated the Budget Bill changes one month before:

> The volume has gone down considerably and I think the staffing - - the current staffing adequately represents the workload we have. I personally have a feeling that our workload may increase, so during the next biennial budget you know perhaps there will be a request for additional staffing, but as it is right now we're more than capable of handling the workload we have assigned to us. *See Wisconsin Eye video at 4:10.*

Daley later said more about his belief regarding the potential for needing more staff:

> I think with Act 10 and Act 150, as there becomes a greater familiarity with these – as there becomes a greater comfort level of what to expect in process – I think that the process may be utilized more often than it is right now. Um, it's still new and this may be an inhibitor to some people moving forward, but as they go through the process, as I believe they realize that they're treated fairly in that process, I think more state employees may recognize this as an avenue that they wish to pursue. Um, I may be completely wrong on that, but I tend to think that we may see an uptick. But as of right now again I think our staffing is more than adequate for the levels that we currently have. *See Wisconsin Eye Video at 5:45*.

59. Daley did not reveal to the legislative committee during his October testimony that he was planning to make cuts to the WERC beyond what the Budget Bill imposed. Indeed, he testified that he thought the staffing level was appropriate.

60. On September 20, 2017, Davis was carrying 15 active cases, Carne was carrying 13 active cases, and Jones was carrying 10. Thus, when Daley became Chair of the agency on September 23, 2017, the caseloads of its attorneys were roughly even, with Carne carrying two fewer cases than Davis and a three more than Jones.

61. Then, in the time between Daley's appointment on September 23, 2017, and November 27, 2017, of the 21 non-election cases filed with the WERC, Daley would assign only two of those cases to Carne. All of the other cases (except one Daley assigned to himself) went to Jones and Davis. The first case to Carne would be assigned on October 12, 2017, and the second would be assigned on October 24, 2017, two days prior to Daley's confirmation hearing. Daley would assign no cases to Carne after his confirmation hearing.

62. The two cases assigned to Carne would be not the mediation cases and not the arbitration cases, but rather state personnel appeal low-level suspension cases, which were known to be at the very bottom of the hierarchy of cases preferred by the WERC Staff Attorneys.

63. Certain cases—these are collective bargaining arbitration cases—are assigned through a process in which parties are provided a list of WERC staff attorney arbitrators, allowing the parties to select the arbitrator from the list through a privately agreed upon process. After the Act 10 reductions in staff, the names of all available arbitrators at the agency were listed. In the few years leading up to Daley's appointment, providing the names of all available arbitrators had become the standard practice.

64. Also, when Daley became Chairman there were only four people available to provide arbitration services: Carne, Davis, and Jones were available, and Daley recently had started making himself available as an arbitrator, as well. Yet, starting in September 2017, lists of arbitrators began going out that did not include Carne as an option. This was a significant change, yet Carne was never told that her name was being removed from arbitration panels.

65. In the week of December 11, 2017, Carne received a telephone call at her office from an individual who serves as a representative of a party that frequently uses the WERC's arbitration services. Carne had handled cases involving this individual in the past. The purpose of

the call was to ask Carne why her name was no longer going out on panels and whether she was still acting as an arbitrator. Carne immediately established for the individual that she was still functioning as an arbitrator and would inquire as to why her name was not appearing on panels. She felt concerned that Daley's actions had begun to affect her professional reputation in the labor and employment community as an arbitrator.

     66.    On December 21, 2017, Carne sent the following email message to Daley:

Jim –

Last week, I received a call from a union representative regarding a public-sector arbitration petition he was in the process of filing with our agency. The individual indicated that he recently contacted Peter Davis to request a list of five WERC arbitrators. Peter reportedly responded that he could no longer provide a list of five arbitrations, but would send a list of three. The names on the list were Peter Davis, Raleigh Jones, and you. The representative questioned me over the telephone as to why my name would not appear on such a list. It was difficult and embarrassing to provide a response, to say the least. He also asked me if I continue to be available for joint requests to serve as arbitrator. Given that you and Peter are apparently pulling my name off panels that historically have been randomly generated, I am concerned that you also would not honor a joint request.

Even prior to receiving this telephone call, I had conducted a survey of case assignments using PracticeMaster. Between 9/25/17 when you became the sole commissioner and my survey date of 11/21/17, approximately 21 new cases had been filed at this agency. Of these cases, 10 had been assigned to Peter Davis, 8 had been assigned to Raleigh Jones; you had assigned 1 to yourself; and a total of 2 cases had been assigned to me. Further, it appears that all of the 21 cases except for 3 were labor relations (as opposed to state employee civil service) cases. Both of the cases that were assigned to me are civil service cases. It is well known at this agency that labor relations cases are far more coveted.

Aside from being the individual making case assignments, you certainly would be aware of these numbers as a result of a case assignment report you generated and issued to the entire staff of the WERC for the first time on 12/1/17. That report indicated, in highlighted cells, that Peter Davis was carrying 41 active cases; Raleigh Jones was carrying 29 active cases; and I was carrying only 13 active cases.

Since these dates, the case assignment numbers have increased for my

> colleagues but have not changed for me. Although additional cases have been filed with this agency, you have not assigned a case to me for approximately 2 months. This is all happening against the backdrop of you denying my request in early October to go to part-time status and then not responding to me when I asked for an explanation for your decision.
>
> No one, including you, has ever brought any deficiency in my performance to my attention. Indeed, I have made significant contributions to this agency, and the quality of my work and my professional credentials are exceptional. Further, given the fact that you barely have spoken to me since the day I returned to the WERC nearly 2 years ago, you cannot have used any such interaction as a basis for drawing a contrary conclusion about my qualifications as a mediator or arbitrator. Thus, permissible factors cannot explain why your treatment of me is so different from the manner in which you interact with, manage, and assign work to the other professionals working at this agency. The only conclusion I can draw is that you are mistreating me either because of my gender and/or because of some perception regarding my political beliefs.
>
> Your behavior toward me has been unprofessional and possibly unlawful. You seem to be attempting to force me to quit by treating me in a disrespectful manner. Moreover, the situation of which I have now learned, in which my name is not being offered on arbitration panels, impacts my professional reputation as an arbitrator. I think you should know that the level of harm I have experienced at this point is serious and irreparable.

67. Daley responded to this message five hours later with the following: "I acknowledge receipt."

68. In the fall of 2017, Daley decided to lay Carne off from her Staff Attorney position at the WERC. To do so, he needed to draft a layoff plan for submission to and approval by DPM. The plan submitted made the assertion that Carne's layoff was justified by a continuously declining caseload at the WERC since Act 10. In support of this assertion, the layoff plan contained a table setting forth case numbers by fiscal year. That table establishes that there was no decline whatsoever from Fiscal Year 16-17 to Fiscal Year 17-18. In Fiscal Year 16-17, there were 419 election cases filed; on December 31, 2017, at the exact mid-way point of Fiscal Year 17-18, there were 281. Likewise, in Fiscal Year 16-17 there were 175 non-election cases filed; and halfway

through Fiscal Year 17-18, there had been 92 cases filed. With both types of cases, the filings appear to be on the rise from the prior biennium, just as predicted in the WERC's earlier submission to the LFB and in Daley's parroting of that prediction at his confirmation hearing.

69. The layoff plan submitted by the WERC also contained an error Sandine corrected. First, the original layoff plan accounted only for seniority as the justification for Carne's layoff. This analysis was inconsistent with the statutory requirements infamously introduced by Act 150, which subjugated consideration of seniority below the "primary" consideration of job performance. The final draft was amended to account for this statutory requirement, indicating that the identification of Carne as the employee to be laid off was based on seniority only after determining that there were no disciplinary or performance issues that differentiated the three attorneys in the layoff group. Despite this amendment to the layoff plan, there is no indication that any assessment regarding the job performance or relative qualifications of the WERC's Staff Attorneys actually occurred.

70. The WERC issued Carne's layoff notice on January 2, 2017, the same day it was approved by Sandine at DPM.

71. The content of the WERC website inaccurately suggests that the current staffing levels at the agency are attributable only to changes introduced by the 2017-2019 Biennial Budget Bill.

72. While Carne served impartially and fairly in every position she held with the State of Wisconsin, it was openly known that her political beliefs and affiliations were oriented toward those associated with Democrats and liberals. Daley was aware of her beliefs and affiliations.

## FIRST CAUSE OF ACTION AGAINST DALEY
## VIOLATION OF FIRST AMENDMENT RIGHTS

73. The plaintiff realleges and incorporates preceding paragraphs as if set forth fully herein.

74. By engaging in the conduct set forth in this Complaint, Daley violated Carne's rights to free speech when Daley removed Carne from the list of available arbitrators and when he layed her off from her position.

75. By engaging in the conduct set forth in this Complaint, Daley violated Carne's First Amendment rights when he removed her from the available list of arbitrators and when he suspended her because of Carnes' political beliefs or affiliations.

76. Said violation has caused Carne severe and permanent emotional, psychological and economic injuries.

## SECOND CAUSE OF ACTION AGAINST DALEY
## VIOLATION OF 14TH AMENDMENT RIGHTS SEX DISCRIMINATION

77. The plaintiff realleges and incorporates the preceding paragraphs as if set forth fully herein.

78. Carne is female.

79. Daley is male.

80. By engaging in the conduct set forth in this Complaint, Daley discriminated against Carne on account of her sex and denied her equal protection under the law when he removed her from the available list of arbitrators and when he suspended her.

81. Said violation has caused Carne severe and permanent emotional, psychological and economic injuries.

## THIRD CAUSE OF ACTION AGAINST DALEY
## VIOLATION OF 14TH AMENDMENT RIGHTS RETALIATION
## FOR OPPOSING SEX DISCRIMINATION

82. The plaintiff realleges and incorporates the preceding paragraphs as if set forth fully herein.

83. Daley retaliated against Carne on because she complained about sex discrimination when he when he suspended her, in violation of her rights.

84. Said violation has caused Carne severe and permanent emotional, psychological and economic injuries.

WHEREFORE, the plaintiff demands the following relief:

A. An award of compensatory damages against the defendant that will justly compensate the plaintiff for her emotional, psychological and economic losses.

B. An award of punitive damages against Daley for the willful, wanton and reckless acts she has committed against the plaintiff;

C. An award of plaintiff's reasonable attorneys' fees and costs incurred in this action;

D. Pre- and post-judgment interest; and

E. Such other relief as the Court deems just and appropriate.

JURY DEMAND

The plaintiff respectfully requests that this matter be tried before a jury of six (6) competent persons.

Dated this 3rd day of October. 2018.

GINGRAS, CATES & WACHS

BY: *s/ Paul A. Kinne*
.      Paul A. Kinne
       State Bar No. 1021493
       Attorneys for Plaintiff

Mailing Address
8150 Excelsior Dr.
Madison, WI 53717
P: (608)833-2632
F: (608)833-2874
E: kinne@gcwlawyers.com