DANIELLE CARNE,

                    Plaintiff,                         OPINION AND ORDER

    v.

                                                     18-cv-818-wmc

JAMES J. DALEY,

                    Defendant.

Plaintiff Danielle Carne, a laid-off staff attorney at the Wisconsin Employment Relations Commission ("WERC"), asserts First Amendment and Equal Protection Clause claims against her former supervisor, defendant James Daley, who is now WERC's sole Commissioner. Before the court is defendant's motion for summary judgment. (Dkt. #24.) For the reasons that follow, the court will grant the motion in part and deny the motion in part. More specifically, the court will grant defendant's motion as to the First Amendment claim based on protected speech and the Equal Protection claim, but will deny it as to plaintiff's First Amendment political affiliation claim.

## UNDISPUTED FACTS[1]

### A. Overview of The Parties

Plaintiff Danielle Carne was a staff attorney at WERC, an agency of the State of Wisconsin that ironically enough provides dispute resolution and services pertaining to labor and employment matters. Staff Attorneys at WERC act as mediators, arbitrators,

---

[1] Except where specifically noted, these undisputed facts are taken from the formal findings and responses submitted by the parties after resolving all disputes and drawing all inferences in favor of the plaintiff as the non-moving party.

and hearing examiners in a wide range of workplace disputes involving a broad selection of public and private sector employers and employees.

Carne identifies as a "liberal" who aligns herself with the Democratic Party. She began working in Wisconsin state government in 2006. Carne first worked as a staff attorney with WERC from 2006 to 2013. In June 2013, she assumed the position of Chief Legal Counsel in the Wisconsin Office of State Employment Relations ("OSER), and in January 2015, Carne was promoted to Deputy Director of OSER. That same year, however, the Wisconsin Legislature passed 2015 Wisconsin Act 55 (the 2015-2017 Biennial Budget Bill), which among other things abolished OSER. After overseeing the transition of OSER functions into the newly created Division of Personnel Management ("DPM") within the Department of Administration ("DOA"), Carne left her position at DPM to return to WERC as a staff attorney in January 2016 and remained in that position until being terminated through layoff in January 2018.

Defendant James Daley ("Daley") began working for the Wisconsin state government in June 2015 when Governor Walker appointed him as a Commissioner at WERC. For purposes of this motion, Daley does not dispute that he is a "conservative" and aligns himself with the Republican Party. Daley is now the Chair of WERC, a position he has held since September 23, 2017. As a consequence, Daley was Carne's supervisor from that date until her termination in January 2018. In his capacity as Chair, Daley also has authority to make employment decisions including hiring, reprimanding, and terminating WERC employees.

## B. Events Surrounding Act 150

On October 1, 2015, Act 150 was introduced before the Wisconsin Senate. The bill proposed significant changes to the state civil service system. Among other changes, it allowed department heads to determine layoffs based on performance and discipline records rather than restricting these decisions to seniority. Hiring and reinstatement procedures were also affected, and timelines were established to expeditiously process civil service appeals. Governor Walker's administration supported Act 150.

At OSER, Carne had served as one of the key personnel executives in the state working on matters related to the introduction of 2015 Wisconsin Act 150. After Act 150 was introduced in the Wisconsin legislature, the Governor's office directed state agencies to consolidate direct technical or functional concerns or questions in one place. Carne served as the clearinghouse for the functional or technical feedback in her capacity as deputy chair of DPM, and she compiled the technical feedback into a document that was sent to the Governor's office on October 8, 2015. In addition to functional concerns, Carne confided in Greg Gracz, her boss, that other agencies had supplied policy-based feedback as well. Gracz then directed Carne to document any policy-based feedback she received in a separate memo. On October 15, 2015, Gracz then personally delivered this memo unsigned to the Governor's Chief of Staff Rich Zipperer, the Governor's Legislative Liaison Cindy Polzein, and DOA Secretary Scott Neitzel.

Voting along party lines, the Wisconsin Legislature ultimately passed the civil service bill on January 20, 2016. Governor Walker signed the bill into law on February 12, 2016, at the offices of ManPowerGroup.

In May 2016, however, local newspapers ran stories about Carne's unsigned memo. On Sunday, May 1, 2016, the *Milwaukee Journal Sentinel* ran an article titled, "Report Shows Concerns within Walker Administration about Civil Service Changes." The article cited a memorandum delivered to the Governor's office on October 16, 2015, which "strongly criticized" Act 150. The same day, the *Wisconsin State Journal's* front-page article was similarly headlined, "HR Slams Civil Service Changes." It, too, stated that a memorandum to the Governor's office "shows the proposal was deeply controversial even among some on Walker's own administration." Neither article named the memo's author. The Wisconsin State Journal provided key details about the author's work history, including that the author had worked at DPM within DOA but left for another job in the state government.

Carne never publicly revealed she authored the memorandum. Though Daley disputes knowing Carne wrote the unsigned memo, he admits that someone at WERC told him around the time of the media reports that they thought Carne authored the memo. (Daley Dep. (dkt. #10) 63.) Moreover, there is also no dispute that Daley knew Carne previously worked at OSER and DPM before she returned to WERC. In fact, Daley was a commissioner at WERC when Carne returned to the department in January 2016.

### C. Carne Returns to WERC

As a staff attorney, Carne returned to WERC in a classified, non-political, non-policy making position. At the time Carne first began her employment with WERC in 2006, the agency was headed by a three-person commission. With the consent of the Senate, the Commissioners were appointed by the Governor for six-year terms. The

Governor also designated one commissioner to serve as Chair of WERC for a two-year term. In May 2011, during Carne's fifth year of employment at WERC, Republican Governor Scott Walker appointed Attorney James Scott to serve as Chair of WERC.

When Carne resumed her employment in January 2016, Scott was still Chair of WERC, while Rodney Pasch and Daley were the other two Commissioners. Pasch had been appointed in 2011 before Carne's earlier departure; and as noted above, Daley had become a Commissioner in 2015, just before her return. At that time, Peter Davis was serving as Chief Legal Counsel for the agency, a position he had occupied for decades and Raleigh Jones and Karl Hanson were Staff Attorneys. Jones has worked for WERC since 1982 and has held the staff attorney position for 20 years. Hanson was hired in July 2015 and, as described below, left WERC for a position at the Wisconsin Department of Justice in August 2017. Carol Lynch acted as office manager, and Dawn Clark served as the paralegal for WERC. Including Commissioners, attorneys, and support staff, there were a total of ten employees at WERC.

When Carne returned to WERC, Davis introduced her to the staff, including Daley. Both Daley and Carne agree this was the sole, in-person interaction between them during Carne's time at WERC from 2016 to 2018. Although Carne and Daley disagree as to who was responsible for making friendly overtures and claim the other party was coldly hostile at some point or another while working at WERC, they agree that neither party made significant attempts to establish a collegial relationship. (Carne Dep. (dkt. #18) 70:11-13; Daley Dep. (dkt. #10) 75:19-23.) The parties communicated mainly through other staff members or by email.

## D. Daley's View of Carne

As Chair of WERC, Scott was instrumental in rehiring Carne. In contrast, Scott recalls that Daley opposed Carne's rehiring. Specifically, as Scott testified at his deposition, Daley told him, "Why are you bringing that lefty back here or that liberal? We don't need her." (Scott Dep. (dkt. #21) 17.)[2] However, Daley disputes that he opposed Carne's rehiring itself, instead maintaining that he opposed the *procedure* Scott used to rehire Carne, which did not include advertising the position and selecting from a pool of candidates. (Daley Dep. (dkt #10) 49.)

Scott also represents that on more than one occasion, Daley told him that Carne could not be trusted. (Scott Dep. (dkt. #21) 45-46; *id.* at 62 (testifying that Daley told him that Carne could not be trusted "[m]ultiple times, you know, two, three, but I couldn't put a number on it"). In turn, Daley acknowledges making this statement on one occasion. (Daley Dep. (dkt. #10) 19.) Scott also testified at this deposition that Carne was the *only* WERC employee Daley reported distrusting, which Scott attributed to Carne's being a professional woman and Daley feeling inadequate around her.[3] In addition, on August 29, 2017, at a gathering to celebrate staff attorney Hanson's last day of employment with WERC, Carne arrived about 10 minutes late. When she arrived, Daley abruptly left.

---

[2] Carne further avers in her declaration that soon after her return, Scott told her that Daley opposed her rehiring. (Pl.'s PFOFs (dkt. #35) ¶ 35 (citing Carne Decl. (dkt. #36) ¶ 28).) Defendant objects to this proposed finding of facts on hearsay grounds. The court agrees that what Scott told Carne is hearsay, at least for the truth of the matter asserted, but Scott's deposition testimony of what Daley told him is admissible as a statement of a party opponent. Fed. R. Evid. 801(d)(2)(A).

[3] Without foundation, this testimony may not be admissible at trial. For purposes of summary judgment, however, the court will at least consider its possible probative value. *See e.g., Holden v. Capstan Corp.*, No. 17-CV-636-WMC, 2018 WL 5618107, at *3 n.6 (W.D. Wis. Oct. 30, 2018).

Afterward, Carne avers that Scott questioned her about Daley's departure. When Carne could not explain it, Scott responded: "He's okay with [WERC paralegal] Dawn and [WERC office manager] Carol, but that's because they're at a fairly low level. But he doesn't like you because you're a professional." (Pl.'s PFOFs (dkt. #25) ¶ 62 (citing Carne Decl. (dkt. #36) ¶ 45).)[4]

Consistent with the description above, Scott also testified at his deposition that Daley referred to Carne "several times" as "[t]hat lefty" and he also recalled Daley referring to Carne as an "extreme liberal or dangerous liberal." (Scott Dep. (dkt. #21) 16-17, 61-62.) At his deposition, Daley testified that it was "possible" that he referred to Carne as a lefty, which he also testified meant left-of-center or liberal, but disputes that he formed an opinion about Carne's political views while she worked at WERC. (Daley Dep. (dkt. #10) 17-18.) Daley also acknowledged calling office manager Lynch and Davis lefties. Scott even testified that, "Jim Daley indicated he wanted to be rid of Danielle Carne because she was a liberal, an extreme liberal, a lefty" (*id.* at 74), and that Daley made the statements about Carne at the same time he said, "[w]e've got to get rid of her." (*Id.* at 98.) However, Scott also testified that this was his "presumption or supposition," and this testimony may

---

[4] ).) Defendant does not object to this statement as hearsay, which it clearly is. Instead, defendant disputes the proposed fact, directing the court to Scott's deposition testimony, during which he reacted to this statement in Carne's declaration, stating that he "think[s] it was more that he didn't like Danielle." (Def.'s Resp. to Pl.'s PFOFs (dkt. #41) ¶ 62 (quoting Scott Dep. (dkt. #21) 43).) At his deposition, Scott also testified that he believed Daley "did not relate well" with "professional women" and "female attorneys," because he "had never practiced law" and "didn't really have a firm grasp of legal concepts." (Scott Dep. (dkt. #21) 20-21; *id.* at 41 (testifying that Daley had a "problem with women"); *id.* at 79-80 (testifying that his beliefs about Daley's views of women, particularly professional women, were based on his "observations of Jim over a period of two years both in social settings and in professional settings").) At the same time, Scott acknowledged that Daley never told him he had a problem with women, and he could not recall Daley evidencing any problems with women of authority who made appearances in front of WERC.

have been limited to his view of Daley's reaction to Carne's lay-off plan as described below. (*Id.* at 75.)

In addition to Carne's political affiliation (and perhaps sex), Daley had concerns about Carne's close relationship with Scott. Davis testified at his deposition that Scott and Carne had a very good relationship, and Jones testified that Carne had Scott "wrapped around her finger." (Jones Dep. (dkt. #11) 14.) As a joint commissioner, Daley testified that he felt Carne ignored him and Rodney Pasch in their capacities and focused solely on communicating with Chairman Scott. After Scott's departure, office manager Lynch testified that Carne remained in her office with her door closed, no longer having Scott as a conversation partner. Jones and Davis testified that they also noticed a change in her behavior after Daley became chair. (Def.'s PFOFs (dkt. #27) ¶ 99.)

### E. WERC Restructuring

The 2017-2019 Biennial Budget Bill proposed restructuring WERC. It eliminated two commissioner positions and the chief legal counsel position. Furthermore, the bill limited the number of staff attorneys to three. Even before the bill's passage, the then Chief Legal Counsel at WERC, Davis, had announced his intention to "bump back" to a staff attorney position should the budget bill pass. This bump back would then leave WERC with four staff attorneys and funding for only three full-time equivalent ("FTE") positions.

State agencies facing imminent layoffs were required to create a "layoff plan," detailing how it will handle reductions in force. The parties had discussed a layoff plan that Carne proposed in the summer of 2017 with Chairman Scott's approval. Carne's plan

would have avoided a staff attorney layoff by implementing the following changes: Davis would reduce his appointment to .50 FTE; Carne and Jones would each reduce their appointments to .75 FTE; and Hanson would remain at 1.0 FTE. Evidently, this plan was not accepted by DPM. Director of the State Budget Office Waylon Hurlburt and DPM Administrator Greg Gracz drafted a memo indicating that due to the pending Budget Bill voluntary reductions were being blocked. However, Staff Attorney Hanson transferred to the Department of Justice in August 2017 before the passage of 2017-2019 Biennial Budget Bill, making that plan moot.

After the legislature passed the budget bill on September 21, 2017, Davis bumped back to a staff attorney as predicted, bringing the total staff attorneys back to three, the number required under the bill. Governor Walker appointed Daley as Chair and the lone Commissioner of WERC on September 23, 2017.

### F. Daley's Performance

Carne avers that she experienced no performance issues at WERC from 2006 to 2013.[5] She received pay increases and organized a statewide conference on labor relations for advocates and neutrals. While employed by WERC, Carne also served as an adjunct professor at the University of Wisconsin Law School, a position she still holds. Further, Carne avers that by 2016, she had significantly more knowledge about civil service law

---

[5] Carne's performance is not a stated basis for her termination in January 2018. However, during her tenure at OSER, Carne received pay increases and a promotion, in addition to taking on numerous special projects. Carne also served as Acting Director of the Division of OSER from November 2014 to August 2015.

than her colleagues at WERC.

Defendant challenges the factual basis for Carne's claims regarding her knowledge as compared to her colleagues, but these disputes are largely immaterial to the extent that Carne's performance was not the stated basis for her termination. Even so, Daley raises a few concerns about Carne's performance, or rather, Office Manager Lynch raises concerns about Daley's attendance, particularly her use of use of leave without pay, long lunches, and late submission of timesheets. (Lynch Depo.(dkt. #33) 39-43.) None of these concerns were the purported reason for her being laid off either.

## G. Alleged Adverse Actions

### 1. Diminished Workload

As noted above, staff attorneys at WERC serve in a number of different capacities. The cases they handle can be categorized as: personnel actions, mediations, arbitrations, and impartial hearing officers. The WERC Chair is responsible for managing cases assigned to the staff attorneys, also referred to as "examiners" in this context. The Chair assigns personnel actions on a rotating basis, while mediations and arbitrations are assigned at the discretion of the Chair. The Chair assigns mediations based on a number of factors. If the parties requesting mediation jointly recommend an examiner, Daley, as WERC Chair, honors the request. If the parties do not indicate a preference, then Daley assigns the case based on relative workload of the different examiners. Arbitration cases are handled in a similar manner. If the parties requested a specific panel, Daley would also honor that request. If no request was made, paralegal Dawn Clark randomly selected the panel of three Daley, Davis, Carne and Jones. For arbitration cases where the parties did not request

a panel, Daley assigned an examiner based on workload and availability.

The parties dispute whether Daley actually considered workload when assigning cases to examiners after he became Commissioner. At the time of Scott's departure in September 2017, the caseloads of each examiner were roughly equal: Carne had 13 active cases; Davis had 15; and Jones had 10. Between September 23, 2017, and November 27, 2017, WERC received 21 new cases. Of those, Daley assigned only two to Carne, with the remainder assigned to Jones and Davis, other than one case that he assigned to himself. It is not clear from the record how many of these cases were assigned based on requests for a specific examiner rather than consideration of workload. Office Manager Lynch testified at her deposition that Davis was generally requested the most often, followed by Jones, then Carne. Also, there is no dispute that Daley skipped Carne in the assignment of a personnel action case once because she had experienced a death in her family. There is also no dispute that in December 2017, Daley directed Clark to remove Carne from the arbitration panel list because he had decided at that point to lay off Carne.[6]

By the end of November, Carne noted that her case assignments had been reduced. Moreover, in December, Carne learned from a union representative that her name was no longer on the list of WERC arbitrators. Carne raised her concerns with Daley in an email dated December 21, 2017, complaining about her removal from the arbitration panel list and her reduction is workload, and stating,

> permissible factors cannot explain why your treatment of me is
> so different from the manner in which you interact with,

---

[6] Davis contradicts these statements claiming that he, not Daley, had Carne removed from the list of available arbitrators in December of 2017. At the time, Davis was aware that Carne would be laid off.

> manage, and assign work to the other professionals working at
> this agency.  The only conclusion I can draw is that you are
> mistreating me because of my gender and/or because of some
> perception regarding my political beliefs.

(Carne Decl. (dkt. #36) ¶ 69.)  Daley responded that he received the email.  He contacted the DOA regarding the email but not the Department of Workforce Development ("DWD"), the administrative agency that acts as human resources for WERC.

### 2. Daley Selects Carne for Layoff

While Scott chaired WERC, Carne used leave without pay ("LWOP") regularly, bringing her hours close to .75 FTE.  After Governor Walker appointed Daley as Chair of WERC, Daley informed Carne that she could no longer use LWOP in the manner she had under Scott.  On October 10, 2017, Carne requested her appointment be reduced to .75 FTE, citing concerns that WERC did not have enough work for the current staffing levels. Daley denied that request the next day.

Daley states that before receiving Carne's email request to reduce her position, he requested "quantitative stuff" from Lynch.  (Daley Dep. (dkt. #10) 128.)  He further avers that after receiving Carne's email, he began a quantitative analysis of caseloads per examiner.  Daley then decided to layoff an employee based on caseloads and a discussion with Davis about the examiners' workloads.  Daley did not confer with either Carne or Jones, the other staff attorney.  Carne disputes Daley's reasoning for a lay-off, noting that he did not express concerns about staff attorneys' workloads during the pre-budget layoff planning, nor did he express concerns with overstaffing during his confirmation hearing.

Specifically, Carne points to Daley's testimony before the Wisconsin Senate's

Committee on Labor Reform and Regulation on October 26, 2017, during which a state senator asked Daley a question about the volume of work compared to recently downsized staffing levels. Daley responded saying:

> The volume has gone down considerably and I think the staffing -- the current staffing adequately represents the workload we have. I personally have a feeling that our workload may increase, so during the next biennial budget you know perhaps there will be a request for additional staffing, but as it is right now we're more than capable of handling the workload we have assigned to us.

(Def.'s Resp. to Pl.'s PFOF (dkt. #41) ¶ 91.)[7] The parties also dispute whether the actual numbers showed a decline in cases from fiscal year 2016-17 to fiscal year 2017-18.

As for selecting Carne for the lay-off, Daley contends that as there were no "deviation from an acceptable work performance level" or "substantial work product deficiency" that justified selecting Davis, Jones or Carne for the lay-off. (Daley Dep. (dkt. #10) 88-89.) In making this determination, however, Daley contends that he did not consider the three individual's relative performance; instead, he simply considered whether performance "disqualified them or maybe I should say upgrade[d] them as a prime candidate for layoff." (*Id.* at 91.) Daley testified that the next element he considered was seniority, and that Davis and Jones were much more senior than Carne, and that "seniority became the primary element used" in the layoff determination. (*Id.* at 96-97.)

However, prior to finalizing the layoff plan, Daley was discussing Carne's work with Davis and said, "[t]hat's the last straw. I am laying her [Carne] off." (Davis Dep. (dkt.

---

[7] Though the link provided in dkt. #41 appears to be broken, video of Daley's testimony is available at https://wiseye.org/player/?clientID=2789595964&eventID=2017101058.

#17) 43-44.)    Similarly, Lynch testified at her deposition that Daley told her there was going to be a layoff and that he selected Carne because:  she was a "cancer" in the office; she "brought negativity to the office"; and "she did not act as a part of the team."  (Lynch Dep. (dkt. #20) 27-28.)  After this meeting with Lynch, Daley and Lynch met with DPM employees and, at that time, they were instructed to first look at performance issues, and then if there were no serious performance issues or disciplinary records, they could rely on seniority.

In contrast, Carne contends that Daley knew Jones had used WERC resources for the work he did at his church (*see* Lynch Dep. (dkt. #20) 40), and Daley was also aware of Jones' performance issues with writing, both of which Carne contends should have been considered in Daley's decision.  Daley acknowledges that some of Jones' opinions had to be rewritten to address style concerns, but he also maintained that some of Carne's opinions had to be rewritten to modify incorrect information.

At least by November 30, 2017, Daley had selected Carne for layoff.  (Daley Ex. 13 (dkt. #25-13).)  The notice of layoff cited a lack of cases to support current staffing levels.  (*Id.*)  The DPM did not approve the final notice until January 2, 2018.  (Daley Ex. 16 (dkt. #25-16).)  A notice of layoff was sent to Carne that same day.

## OPINION

### I.  First Amendment Claims

Carne asserts two First Amendment claims, one based on speech arising out of her anonymous October 2015 memo detailing criticisms of then-proposed Act 150, and the

other claim based on political affiliation.  The court will address each in turn.

## A. Speech

"The First Amendment, incorporated against the states through the Fourteenth Amendment, shields government employees from retaliation for engaging in protected speech." *Milliman v. Cty. of McHenry*, 893 F.3d 422, 430 (7th Cir. 2018) (quoting *Diadenko v. Folino*, 741 F.3d 751, 755 (7th Cir. 2013)) (internal quotation marks omitted). Plaintiff alleges that Daley retaliated against her based on the exercise of First Amendment rights to issue her October 2015 anonymous memo opposing Act 150.  To prevail on this claim, Carne must demonstrate that (1) she engaged in constitutionally protected speech; (2) she suffered a deprivation because of her employer's action; and (3) her protected speech was a but-for cause of the employer's action." *Milliman*, 893 F.3d at 430.

The parties dispute the causation standard for this claim.  As the Seventh Circuit explained in *Milliman*, "a plaintiff must 'show that a violation of [her] First Amendment rights was a motivating factor of the harm [s]he's complaining of.'" *Id.* (quoting *Thayer v. Chiczewski*, 705 F.3d 237, 251 (7th Cir. 2012); *Greene v. Doruff*, 660 F.3d 975, 977 (7th Cir. 2011)).  After a plaintiff makes that showing, then "the burden shifts to the defendant to show that the harm would have occurred anyway." *Id.* at 430-31 (quoting *Thayer*, 705 F.3d at 251–52; *Greene*, 660 F.3d at 977). "Once a defendant produces evidence that the same decision would have been made in the absence of the protected speech, the burden shifts back to the plaintiff to demonstrate that the proffered reason was pretextual and that the real reason was retaliatory animus." *Id.* at 431 (quoting *Thayer*, 705 F.3d at 252) (internal quotation marks omitted).

Defendant's motion for summary judgment turns on the first element: whether Carne's drafting and circulation of the October 2015 memo constitutes protected speech. "The inquiry into the protected status of speech is one of law, not fact." *McArdle v. Peoria School Dist. No. 150*, 705 F.3d 751, 754 (7th Cir. 2013) (citing *Spiegla v. Hull*, 481 F.3d 961, 965 (7th Cir. 2007)). In the context of a public employee, "[s]peech is constitutionally protected if (1) the employee spoke 'as a citizen on matters of public concern' and (2) his interest in commenting upon those matters outweighs the employer's interest in promoting the efficiency of its services." *Id.* (quoting *Swearnigen-El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 861-62 (7th Cir. 2010). "When employees make statements 'pursuant to their official duties,' they are not speaking 'as citizens' for First Amendment purposes." *Swearnigen-El*, 602 F.3d at 862 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)).[8]

Here, the undisputed evidence demonstrates that Carne drafted the October 15 memo in her capacity as Deputy Chair of DPM at the direction of her boss and not as a private citizen. In response to this evidence, plaintiff points out that she was not employed by WERC at the time she drafted the memo. (Pl.'s Opp'n (dkt. #30) 39.) While true, there is no dispute that she was still a public employee at that time, and plaintiff offers nothing to rebut a finding that she drafted the October 15 memo pursuant to her official

---

[8] The Seventh Circuit recently considered a First Amendment claim involving speech of a public employee, but opted to explore a "different path" because "the employee's speech is neither at work nor about work." *See Harnishfeger v. United States*, No. 18-1865, 2019 WL 6486869, at *5 (7th Cir. Dec. 3, 2019) (discussing *United States v. National Treasury Employees Union*, 513 U.S. 454 (1995)). The facts of that case, however, are distinguishable from the memo at issue here; therefore, this alternative path for determining whether a public employee's speech is protected is not relevant.

duties.  In response, plaintiff contends that *Garcetti*, 547 U.S. 310, should not be read to restrict protection of public employees from retaliatory actions of *future* employees.  The question, however, of whether the speech is protected does not turn on the subsequent retaliatory actions.  Instead, the court simply considers the context of the speech itself.  Since there is no dispute that Carne was speaking as a public employee in drafting a memo critical of Act 150, this speech is not protected by the First Amendment.

### B. Political Affiliation

"The First Amendment prohibits public employers from firing an employee based on that employee's constitutionally protected political conduct." *Daza v. Indiana*, 941 F.3d 303, 308 (7th Cir. 2019) (quoting *Elrod v. Burns*, 427 U.S. 347, 357 (1976)); *see also Rutan v. Republican Party of Illinois,* 497 U.S. 62, 75 (1990) (extending the holding in *Elrod* and other cases that "promotions, transfers, and recalls after layoffs based on political affiliation or support are an impermissible infringement on the First Amendment rights of public employees").[9]  Plaintiff alleges that her workload was reduced and she was terminated because of her political affiliation as a liberal, aligning herself with the Democratic party.  "[T]o prove discrimination based on political affiliation, a plaintiff must present evidence relevant to the question of whether the plaintiff's political affiliation was a motivating factor in their employer's action." *Daza*, 941 F.3d at 310.  At summary judgment, if a plaintiff presents a prima facie case, then the same burden shifting approach as described

---

[9] There is an exception to this general rule for employees in "policymaking or confidential positions," but defendant does not argue that Carne filled such a role in her staff attorney position at WERC.  *See Hagan v. Quinn*, 867 F.3d 816, 824 (7th Cir. 2017).

above with respect to political speech applies in the political affiliation context. *See Brown v. Cty. of Cook*, 661 F.3d 333, 335 (7th Cir. 2011) (explaining that "motivating factor" analysis in *Mt. Healthy* still applied to First Amendment political affiliation discrimination claims) (citing *Greene*, 660 F.3d 975).

To prove the causation element of her claim, Carne "may rely on both direct and circumstantial evidence." *Lavite v. Dunstan*, 932 F.3d 1020, 1031 (7th Cir. 2019) (citing *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643-44 (7th Cir. 2013); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965-66 (7th Cir. 2012)). "Direct evidence is evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Id.* (quoting *Kidwell*, 679 F.3d at 965) (internal quotation marks omitted). "Circumstantial evidence may include suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group." *Id.* (citing *Long v. Teachers' Retirement Sys. of Ill.*, 585 F.3d 344, 350 (7th Cir. 2009)).

In support of her claim, Carne largely relies on Scott's testimony about what Daley said. Scott testified extensively about statements Daley made, with Carne's best evidence consisting of the following passage:

> Q. Did Mr. Daley ever tell you he would lay Ms. Carne off because of her political views?
>
> A. That specific terminology? Jim Daley indicated he wanted to be rid of Danielle Carne because she was a liberal, an extreme liberal, a lefty. He didn't -- he didn't characterize it as, "Her political views". That's what he characterized it as.
>
> Q. So you're telling me that Mr. Daley explicitly linked his desired to rid the WERC of Danielle Carne to the fact that she

was an extreme lefty?

A.  Correct.

Q. When did he do it?

A.  He criticized my bringing her back when I brought her back on the transfer, and when we were -- when they -- when the staff put together this reduction plan, Jim made it clear that he didn't agree with that, and I presumed -- well, let me back up. Jim made it clear that he wanted Danielle gone, and in his mind, I'm sure -- I'm making the supposition -- because she was an opportunity to lay off one person as a result of the budget that he wanted the opportunity to lay her off.

Q.  All right.  But that is, as you put it, a presumption or a supposition on your part?

A.  That is correct.

(Scott Dep. (dkt. #21) 74-75.)

The beginning of this passage could be viewed as direct evidence of discrimination on the basis of political affiliation, but the subsequent exchange could be read as Scott back-tracking from any testimony *expressly* linking Daley's labeling of Carne as a lefty or liberal to his subsequent decision to terminate her employment.

However, Scott also testified at his deposition that at the time of Carne's rehiring, Daley told Scott, "Why are you bringing that lefty back here or that liberal?  We don't need her."  (Scott Dep. (dkt. #21) 17.)  Moreover, Scott testified that Daley "several times" called Carne "[t]hat lefty" and also recalled Daley referring to Carne as an "extreme liberal or dangerous liberal."  (Scott Dep. (dkt. #21) 16-17, 61-62.)  Even if the earlier, quoted passage does not constitute direct evidence of discriminatory intent, this testimony constitutes relatively strong circumstantial evidence in support of Carne's claim.

Moreover, Carne points to (1) Daley's comments to Scott that Carne could not be trusted and his statement to Office Manager Lynch that Carne was a "cancer" in the office; (2) Daley's refusal to speak to Carne, and his general dislike of her; and (3) the timing of the decision, coming on the heels of Daley gaining the unfettered authority to terminate her employment as the sole Commissioner. While perhaps this evidence simply supports a finding that Daley disliked Carne, for reasons unrelated to her political affiliation, a reasonable jury could infer discriminatory intent on the basis of Carne's political affiliation. At minimum, Carne has provided a sufficient basis for a reasonable jury to conclude that Daley was motivated by her political affiliation in first reducing her workload and then selecting her for layoff.

In addition to this evidence, Carne challenges defendant's position that a lay-off was necessary at all, pointing to Daley's contemporaneous statements to a legislative committee that "current staffing adequately represents the workload we have," but that "our workload may increase." (Def.'s Resp. to Pl.'s PFOF (dkt. #41) ¶ 91.) There are also disputed fact issues as to whether Daley's stated reason for selecting her for the lay-off -- seniority -- was the actual reason. Based on all of this, the court concludes that Daley has put forth sufficient evidence to support a finding that Daley violated her First Amendment rights by discriminating against her based on her political affiliation.

## II. Equal Protection Claim

This leaves Carne's sex discrimination claim against Daley under the Equal Protection Clause of the Fourteenth Amendment, alleging that he discriminated against

her based on her sex.[10]  The Seventh Circuit has held that "the same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection."  *Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003).  Defendant seeks summary judgment of this claim on the basis that a reasonably jury could not conclude that Daley intentionally discriminated against her on the basis of her sex from Carne's limited evidence.

In recent cases, the Seventh Circuit has discouraged district courts from separating evidence under different methods of proof," in particular the indirect method or the direct method articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1975).  Instead, the Seventh Circuit encourages courts to consider evidence "as a whole."  *Golla v. Office of the Chief Judge of Cook Cty.*, 875 F.3d 404, 407 (7th Cir. 2017) (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). Still, the *McDonnell Douglas* framework remains useful in certain contexts, this case being one.  *Ortiz*, 834 F.3d at 766.

To establish a prima facie case of an equal protection violation under the *McDonnell Douglas* framework, plaintiff must show that:  "(1) [s]he is a member of a protected class, (2) [s]he is similarly situated to members of the unprotected class, (3) [s]he suffered an adverse employment action, and (4) [s]he was treated differently from members of the [un]protected class."  *Williams*, 342 F.3d at 788.  Proof of these four factors would ordinarily be sufficient for plaintiff to make a prima facie showing that (1) "defendants treated her differently from others who were similarly situated," and (2) this differential treatment was "because of her membership in the class to which she belonged."  *Hedrich v.*

---

[10] Plaintiff also asserted an Equal Protection retaliation claim based on her December 21, 2017, email to Daley detailing her concerns about the reduction in her workload and being removed from the arbitration panel.  In her opposition brief, however, plaintiff forfeits this claim.

*Bd. of Regents of the Univ. of Wis. Sys.*, 274 F.3d 1174, 1183 (7th Cir. 2001). Having made this showing, the burden shifts to the defendant to put forward a nondiscriminatory, legitimate reason for their actions. *Williams*, 342 F.3d. at 788. Finally, if the defendants have met this burden, plaintiff must demonstrate that the reasons offered were pretextual. *Id.*

Here, plaintiff has put forth sufficient evidence to establish a prima facie case. She is a woman; she was similarly situated to the other staff attorney at WERC, Raleigh Jones, who is a man; she was laid-off; and Jones was not. Daley responds and claims that the workload justified a lay-off and that she was selected because she had the least seniority. Now, the burden shifts back to plaintiff to demonstrate that Daley's reasons are pretext for his real reason of terminating her because she is a woman.

Unlike the First Amendment political affiliation claim, where plaintiff had evidence, including possible direct evidence, to support a reasonable jury finding that Daley discriminated against her because she was a liberal, Carne's evidence in support of her sex discrimination claim falls short. Carne's evidence is limited to Scott's impression of Daley's view of women generally, and professional women specifically. With respect to this claim, Scott does not point to *any* statements by *Daley himself*, and he could not recall any specific examples of Daley treating women differently, other than to testify that Scott's views were based generally on observing Daley over a two-year period of time. Moreover, when Scott was asked to respond to Carne's declaration in which she averred to a statement by Scott that Daley had a problem with professional women, Scott stated, he "think[s] it was more that he didn't like Danielle." (Def.'s Resp. to Pl.'s PFOFs (dkt. #41) ¶ 62 (quoting Scott

Dep. (dkt. #21) 43).)[11]

While Carne has evidence to call into question whether the layoff was necessary and whether seniority was the reason for her selection -- as described in more detail above -- this evidence does not point to her sex as the reason for the differential treatment and ultimate termination of her employment.  *See Essex v. United Parcel Serv., Inc.*, 111 F.3d 1304, 1310 (7th Cir. 1997) ("The fact that the employer was mistaken or based its decision on bad policy, or even just plain stupidity, goes nowhere as evidence that the proffered explanation is pretextual.").  A jury would have to speculate to make such a finding. Accordingly, the court will grant summary judgment to defendant on her Equal Protection claim.

## ORDER

IT IS ORDERED that defendant James Daley's motion for summary judgment (dkt. #24) is GRANTED IN PART AND DENIED IN PART.

Entered this 20th day of December, 2019.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

---

[11] Defendant anticipates that Carne would also rely on Daley signing off on an opinion overturning the termination of a male state employee who posted a threatening image of a female co-worker. Carne, however, does not rely on this opinion, and for good reason.  That decision was a unanimous one by all three commissioners, and during her deposition, Carne could not explain why this decision would be evidence of discriminatory animus on the part of Daley, but not on the part of Scott.  (Def.'s PFOFs (dkt. #27) ¶ 35 (citing Carne Dep. (dkt. #18) 171-72).)